IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ROBIN D. STROTHER and
GAIL J. CRAMER,

Plaintiffs,

v.                                                          No. 15-CV-38 MCA/CG

KATHY L. STEELE,

Defendant/Counterclaimant.


## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on *Plaintiffs' First Motion for Summary Judgment on Counts 3 and 4 of Counterclaim: Issues of Accounting and Segregation of Accounts and Memorandum of Law in Support Thereof* [Doc. 56]; *Plaintiffs' Second Motion for Summary Judgment on Counts 1 and 2 of Counterclaim: Issues of Whether Plaintiffs Had Duty to Report and Provide Copy of Trust Agreement and Memorandum of Law in Support Thereof* [Doc. 57]; *Plaintiffs' Third Motion for Summary Judgment on Counts 5 and 6 of Counterclaim:  Issues of Payment of Robin D. Strother Medical Bills and Distributions to Ruth's Church and Caretaker* [Doc. 59]; *Plaintiffs' Fourth Motion for Summary Judgment on Their Complaint for Declaratory Judgment and Memorandum of Law in Support Thereof*  [Doc. 60]; and *Defendant's Motion for Partial Summary Judgment on Complaint and Counts 1, 2, 3, and 5 of the Counterclaim* [Doc. 62]. The Court has considered the parties' submissions, the relevant law, and the record, and has otherwise been fully advised in the premises.

**BACKGROUND**

This lawsuit arises from a dispute over the Ralph L. Strother & Ruth L. Strother Living Trust (the Trust)—primarily raising the issue of the extent to which Steele, a beneficiary of the Trust, is entitled to information about the Trust from Plaintiffs, who are the Trustees, before the Trust assets may be finally distributed.  [Doc. 1]

Mr. and Mrs. Strother (the Strothers) created the Trust in New Mexico in 1993, and amended the Trust document on October 22, 1999.  [Doc.56-2]  Pursuant to the 1999 amendment, the Strothers, along with two of their three children, Robin Strother and Gail Cramer (hereinafter "Siblings") were designated as the trustees.  [Doc. 56-2 p. 12]  Mr. Strother died in November 1999.   [Doc. 56 p. 6; Doc. 56-1 ¶ 1]  Mr. Strother's death triggered a provision in the Trust that required the Trust to be divided into two separate trusts, respectively called "Trust 1" and "Trust 2."  [Doc. 56-2 ¶ VI]  The Trust documents designated Mrs. Strother and Siblings trustees of Trust 1 and Trust 2.  [Doc. 56-2 ¶ IV]

According to the terms of the Trust, Trust 1 was to comprise specifically enumerated assets, amounting to approximately one half of the Trust assets, not to exceed $600,000 in value or the amount exempt from federal estate taxation, whichever was less; and Trust 2 was to comprise, among other specifically enumerated assets, all of the remaining assets of the Trust.  [Doc. 56-2 ¶¶ VI]  The trustees were granted the authority to distribute assets from the Trust to Trust 1 and Trust 2 to accomplish this allocation. [Doc. 56-2 ¶ 6.1.1]  After Mr. Strother died, Siblings and Mrs. Strother hired an accountant to effect the allocation and handle the Trusts' tax matters.  [Doc. 56 p. 26;

Doc. 56-1 ¶ 4; Doc. 56-3, Doc. 56-4, Doc. 56-5 ¶ 4]  43.3% of the Trust assets were allocated to Trust 1, the value of which was $650,000, and 56.7% of the assets were allocated to Trust 2.  [Doc. 56 ¶¶ 4, 6; Doc. 56-3]  Mrs. Strother, as the surviving settlor was entitled to all of the income from the Trusts during her lifetime.  [Doc. 56-2 ¶ 6.4.3]

Following Mr. Strother's death until mid-2012, Mrs. Strother handled her own, and the Trust's, financial affairs.  [Doc. 56 ¶ 9; Doc. 56-1 ¶ 4; Doc. 56-3 p. 3; Doc. 56-5 ¶¶ 4, 15, 16; Doc. 63-2 p. 2]  In June 2012 Mrs. Strother was diagnosed with Alzheimer's disease, and in June or July 2012 she took residence in an Alzheimer's facility where she resided until her death on November 13, 2013.  [Doc. 56-1 ¶ 1; 56-5 ¶¶ 6-7; Doc. 63-2 p. 2]  After Mrs. Strother took residence in the Alzheimer's facility, Siblings took over management of the Trust.  [Doc. 63-2 p. 2; Doc. 88-1 ¶ 6]

The principal of Trusts 1 and 2 was never invaded, and from the time that Mr. Strother died to the time that Mrs. Strother died, the value of the Trust increased by approximately $521,000 from about $1.4 million to about $2 million.  [Doc. 56-1 ¶ 15] Pursuant to the terms of the Trust, within "a reasonable time" after the surviving settlor's death Trust 1 and Trust 2 are to be finally distributed in equal shares to the Strothers' Children (Siblings and Steele).  [Doc. 56-2 ¶ 7.1]

Siblings and Steele have had and continue to have an adversarial relationship. [Doc. 1 ¶ 13; Doc. 56-5 ¶ 10; Doc. 68-1 ¶ 6]  Steele has repeatedly demanded information and documents relating to accounting and distributions of the Trust.  [Doc. 1 ¶ 13; Doc. 11 ¶ 8]  Steele's refusal to accept a final distribution of the Trust's funds, and her opposition to a final distribution of the Trust's funds to Siblings led Siblings to file

3

the present lawsuit.  [Doc. 1 ¶ 13]  Additional facts are provided, as necessary, in the context of the Court's discussion and analysis.

Siblings filed a *Complaint for Declaratory Judgment and Order Approving Final Distribution of Trust Estate by Trustee*s (hereinafter "the *Complaint*").  [Doc. 1]  In the *Complaint*, Siblings sought a judgment and order directing them to prepare an accounting and trustee's report for the period commencing on the date of Mrs. Strother's death and ending on the date of the Court's final order; a judgment and order approving the final distribution of the Trust to Siblings and Steele in equal shares; a declaration that, following these distributions, the Trust shall have been "fully and properly distributed"; and an order that court expenses incurred by Siblings shall be paid by the Trust.  [Doc. 1 ¶ 21]  Steele answered the *Complaint*, and she filed a six-count *Counterclaim* in which she seeks damages against Siblings on the ground that, in their capacities as trustees, they breached various fiduciary duties owed to her as a beneficiary; made unauthorized distributions of the Trust assets; and engaged in self-dealing.  [Doc. 8]

Siblings and Steele have filed several dispositive motions.  In a previously entered *Memorandum Opinion and Order*, the Court disposed of *Defendant's Motion for Judgment on the Pleadings* (Doc. 40, 41) in which Steele sought an order requiring Siblings to provide "accountings of Trust 1 and Trust 2 from October 22, 1999 [the date on which they became trustees of the Trust], until any such accountings are completed." [Doc. 98]  The Court now addresses the parties' several Motions for Summary Judgment on the *Complaint* and the *Counterclaim*.

**Summary Judgment Standard**

4

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)  "[T]he substantive law will identify which facts are material"; and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

**Siblings' First Motion for Summary Judgment**

Siblings' First Motion for Summary Judgment pertains to Counts 3 and 4 of the *Counterclaim*.  [Doc. 56]  Count 3 of the *Counterclaim* alleges a "breach of fiduciary duty to report or account."  [Doc. 8 p. 7]  Count 4 of the *Counterclaim* alleges "failures to segregate and keep separate accounts."  [Doc. 8 p. 9]  The Court addresses these claims, and Siblings' arguments in favor of summary judgment as to these claims, in turn.

Insofar as the issues raised in Counts 3 and 4 require the Court to construe the provisions of the trust instrument, "the [C]ourt must attempt to ascertain and give effect to the [settlors'] intent." *In re Cable Family Trust*, 231 P.3d 108, 111 (N.M. 2010).  This is achieved by relying, primarily, upon "the plain language of each provision of the trust when read in conjunction with the document as a whole." *Id.*  To the extent that the terms of the trust are ambiguous, the Court may consider extrinsic evidence of the settlors' intent. *Id.*

**Count 3**

Count 3 of the *Counterclaim* is premised on Steele's interpretation of the "Accounting" provision, Section 9.1, of the Trust.  In relevant part, Section 9.1 provides that "[t]he SUCCESSOR TRUSTEES shall render at least semi-annually an account of income and principal, including a statement of all receipts, disbursements and capital changes, to SETTLORS or after their death, to beneficiaries."  [Doc. 8 ¶ 25; Doc. 56-2 ¶ 9.1]  In Steele's view, Section 9.1 of the Trust required Siblings to provide her with a semi-annual accounting of Trust 1 and Trust 2 from the point at which they became irrevocable.  [Doc. 8 ¶¶ 25, 26]  Hence in Count 3 of the *Counterclaim*, Steele alleges that Siblings had, and breached, a duty to provide her with a semi-annual accounting: (1) of Trust 1 upon Mr. Strother's death, and (2) of Trust 2 from January 2005 (when, Steele alleges, Mrs. Strother became incapacitated) to the date of Mrs. Strother's death.  [Doc. 8 ¶¶ 20-27]

Siblings argue that they were not "successor trustees" as that term is used in the Trust, and, as such, they had no affirmative duty under Section 9.1 to render a semi-annual accounting to Steele.[1]  [Doc. 56 p. 12-15]  The Court concludes that Siblings are entitled to judgment as a matter of law on this ground.

As noted earlier, the Trust document originated in 1993, and it was amended in 1999.  [Doc. 56-2 p. 11-13]  Paragraph IV of the original trust document was titled "Successor Trustees."  It provided, in relevant part, that

---

[1] Steele contends that Siblings' argument in this regard constitutes "a new claim" that cannot be raised for the first time in a motion for summary judgment.  [Doc. 68 p. 3-10]  The Court disagrees.  Siblings' lack of duty argument constitutes a defense, not a "claim."

> [i]n the event of the death of a TRUSTEE then the surviving TRUSTEE and [Siblings] shall be the TRUSTEES. . . . Said SUCCESSOR TRUSTEES, or the survivor of them, after the death of both SETTLORS, shall have the power to amend this Trust to provide for SUCCESSOR TRUSTEES in the event of death, resignation or incapacity.  No one dealing with the TRUSTEES hereunder or any SUCCESSOR TRUSTEEES need at any time inquire as to their authority to do any acts authorized under this Agreement.

[Doc. 56-2 (¶ IV)]  Thus, in the original Trust document, Siblings were variously designated as "trustees" (upon Mr. Strother's death) and "successor trustees," and as such, were arguably charged with the semi-annual accounting duty described in Section 9.1.

In 1999, however, that provision of the Trust was amended.  The amendment deleted paragraph IV of the original trust document in its entirety and replaced it with the following amended paragraph IV, also titled "Successor Trustees":

> In the event of the death of SETTLOR/TRUSTEE, then the surviving TRUSTEES, or sole survivor, shall continue to be the TRUSTEES, and the signature of any one of the TRUSTEES shall be sufficient at any time for any purpose, including the conveyance of real or personal property.  The surviving TRUSTEES, or sole survivor, shall have the power to amend this Trust *or to provide for Successor Trustees in the event of the death, resignation or incapacity of all four TRUSTEES.*

[Doc. 56-2 (emphasis added)]  Further, the 1999 amendment clearly designated Mr. Strother, Mrs. Strother, and Siblings as "The TRUSTEES under this Trust[.]"  [Doc. 56-2 p. 12]  Thus, as amended, the Trust document drew a clear distinction between the trustees (including Siblings) and Successor Trustees—who would be chosen only in the event of certain contingencies.   Paragraph 9.1 was never amended.

Viewing the amended paragraph IV together with Paragraph 9.1 the Court concludes that Siblings had no affirmative duty under Paragraph 9.1 of the Trust to render a semi-annual accounting.  Section 9.1 imposes an affirmative duty upon "successor trustees," to render semi-annual accounts of income and principal to settlors or beneficiaries.  [Doc. 56-2 ¶ 9.1]  "Trustees," on the other hand, are under no such obligation.  The Court concludes that by unambiguously excluding Siblings from the designation of "successor trustees", the 1999 amendment removed Siblings from the purview of Section 9.1.

In sum, the Trust imposed no duty upon Siblings to render a semi-annual accounting.  As a matter of law, Siblings may not be held liable for breaching a duty that the Trust did not impose upon them.  Accordingly, the Court grants Siblings' *Motion for Summary Judgment* as to Count 3 of the *Counterclaim*.

**Count 4**

In Count 4 of the *Counterclaim* Steele alleges that Siblings had a duty under the terms of the Trust to segregate and keep separate accounts of Trust 1 and Trust 2.  [Doc. 8 ¶¶ 28-31]  Steele alleges that Siblings breached this duty, thereby causing her to suffer damages.  [Id.]  Siblings contend that under the terms of the Trust, they had no duty to segregate the assets that were allocated to Trusts 1 and Trust 2.  [Doc. 56 p. 28]  Further, they contend that Steele has not suffered any damages as a result of the assets having not been held in separate accounts.  [Id.]  Steele has not responded to Siblings' arguments pertaining to Count 4.  [See Doc. 68]

The following evidence relevant to Count 4 of the *Counterclaim* is uncontroverted. The terms of the Trust required that after the death of one settlor, Trust 1 was to be created having assets "not to exceed $600,000.00 in value, or the amount . . . exempt from federal estate taxation, whichever amount is less[.]"  [Doc. 56-2 ¶ 6.1.1]  The remaining assets were to be allocated to Trust 2.  [Doc. 56-2 ¶¶ 6.3-6.3.6]  The trustees were given "discretion [to] allocate property or interest in property in cash or in kind, or partly in cash or partly in kind, or in any other manner that [they] deem[ed] in the best interest of the beneficiaries of the Trust."  [Doc. 56-2 ¶ 6.1.1.1]  In their discretion, the trustees could "cause any share to be composed of cash, property or undivided fractional interests in property different in kind from any other share[.]"  [Doc. 56-2 ¶ 8.9]  The trustees also had discretion to manage the liquid assets of the Trust as they chose.  [Doc. 56-2 ¶ 8.15]  Siblings and Mrs. Strother were not required under the terms of the Trust to hold the assets allocated to Trust 1 and Trust 2 in separate banking or investment accounts.

Based upon the foregoing facts, and from a review and consideration of the Trust document as a whole, the Court concludes that Siblings contention that the Trust did not impose a duty upon them to segregate the assets allocated to Trusts 1 and 2 is correct. Siblings, having had no such duty, cannot be held liable for the alleged breach; and by extension, cannot be held liable for any hypothetical damages.  Siblings are entitled to judgment as a matter of law as to Count 4 of the *Counterclaim*.

**Siblings' Second Motion for Summary Judgment**

Siblings' Second Motion for Summary Judgment pertains to Counts 1 and 2 of the *Counterclaim*. [Doc. 57] Broadly speaking, Counts 1 and 2 are premised on Siblings' alleged violation of the duty of a trustee to "inform and report" set forth in Section 46A-8-813 of the UTC. Before turning to the specific issues raised by Steele, the Court provides an overview of the relevant law.

Pursuant to the Uniform Trust Code (the UTC), NMSA 1978, Sections 46A-1-101 to -1105 (2003, as amended through 2012), a trustee is required to keep "qualified beneficiaries of the trust reasonably informed about the administration of the trust and of the material facts necessary for them to protect their interests." Section 46A-8-813(A). This provision of the UTC echoes the common law principle that a trustee has a duty to "to keep . . . beneficiaries reasonably informed of changes involving the trusteeship and about other significant developments concerning the trust and its administration, particularly material information needed by beneficiaries for the protection of their interests." Restatement (Third) of Trusts § 82(1)(c) (Am. Law Inst. 2007); *see also* § 46A-1-106 ("The common law of trusts and principles of equity supplement the UTC[.]"). In a related provision, the UTC also provides that "upon request of a beneficiary, [a trustee of an irrevocable trust is required to] promptly furnish to the beneficiary a copy of the trust instrument[.]" Section 46A-8-813(B)(1). This, too, represents a codification of a common law principle. *See* Restatement (Third) of Trusts § 82(2)("[A] trustee . . . ordinarily has a duty . . . to permit beneficiaries on a reasonable basis to inspect trust documents[.]"). Counts 1 and 2 pertain to these closely related duties, as such, they will be discussed together.

In Count 1 Steele alleges that Siblings failed to keep her informed about the administration of Trusts 1 and 2 and failed to provide information necessary to allow her to protect her interest therein.  [Doc. 8 (¶¶ 11-14)]  In Count 2 Steele alleges that Siblings failed to furnish her with a copy of the trust when she requested one in October 2012.  [Doc. 8 ¶¶ 15-19]  Steele alleges that these omissions, which constituted breaches of the duties prescribed by the UTC and the common law, caused her to suffer monetary damages.  [Doc. 8 ¶¶ 14, 19]  Siblings seek summary judgment on the ground, among others, that Steele has not shown, and cannot show, that she suffered damages as a result of the breaches alleged in Counts 1 and 2 of the *Counterclaim*.  [Doc. 57 p.10, Doc. 90 p. 3]  For the reasons that follow, the Court agrees with Siblings.

Pursuant to the terms of the Trust, the trustees were granted discretion and power to manage the Trust assets as they chose.  [Doc. 56-2 ¶ 8.1]  For example, the Trust gave the trustees the power to purchase investments; to "sell, exchange, lease, pledge mortgage, transfer convey or otherwise dispose of . . . any and all property at any time forming a part of the trust estate"; and to manage the liquid assets in checking and savings accounts.  [Doc. 56-2 ¶¶ 8.2, 8.3, 8.15]  The Trust also shielded the trustees from liability for exercising these powers, by providing that the Trustees "shall not be liable to any beneficiary. . . for any action taken pursuant to any powers [granted in the trust] or granted by law."  [Doc. 56-2 ¶ 8.1] Thus, under the terms of the Trust, the beneficiaries alone had the authority and the discretion to manage the Trust estate including decisions to invest or sell the Trust assets.

The duties of a trustee codified in Section 46A-8-813(A) and (B)(1) are intended to ensure that trust beneficiaries can protect their interest in the trust assets by, for example, challenging, or seeking redress for, a trustee's: investment strategy, decision to sell real property owned by the trust, or conversion of the trust's assets.[2]  *See* Restatement (Third) of Trusts § 82 cmt. a, a(2), b-d.  Here, however, Steele had no right to affect the management of the Trust's assets, and no right to recover from the beneficiaries for their discretionary management of the Trust assets.  Nor did Steele have any authority to direct Siblings as to their administration of the Trust, including any decisions they may have made to sell Trust property, invest Trust assets, or manage the Trust accounts.  Therefore, even, assuming that Siblings had, and breached, a duty to inform Steele of the decisions that they made as trustees and to provide her with a copy of the trust documents, Steele has not shown, nor can she show, that the value of the Trust property to which she is entitled was affected by the alleged breach of a duty to keep her informed.[3]  *See* Section 46A-10-1002(A)(1) ("A trustee who commits a breach of trust is liable to the beneficiaries affected for . . . the amount required to restore the value of the trust property

---

[2] Conversion, having not been shown or specifically alleged, is not at issue here.

[3] Moreover, Steele has received an accounting of Trust 1 pursuant to this Court's previously entered order. [Doc. 98 p. 6; Doc. 100]  And, as shown later in this Opinion, the Court concludes that Steele is entitled to a partial accounting of Trust 2.  Steele's claim that she was deprived of an accounting shall have been remedied once she has the information to which she was lawfully entitled.  *In re Rolf H. Brennemann Testamentary Trust*, 849 N.W.2d 458, 465 (Neb. 2014) ("An accounting is ordinarily an appropriate remedy for a breach of the duty to inform and report."); *see* Section 46A-10-1001(B)(4) (stating that a breach of trust may be remedied by ordering a trustee to account); *cf. Vaughn v. Montague*, 924 F.Supp.2d 1256, 1268 (W.D. Wash. 2013) (holding that a claimed breach of fiduciary duty to provide an accounting is rendered moot once the beneficiary has received the accounting to which he was entitled).

and trust distributions to what they would have been had the breach not occurred[.]");

George Gleason Bogert & George Taylor Bogert, *The Law of Trusts and Trustees*, § 871 & n.3 (2d ed. 1995) (stating that if the beneficiary "seeks damages [for a breach of trust], a part of his burden will be proof that the breach caused him a loss"; beneficiaries cannot recover if they fail to prove damages); *SunTrust Bank v. Merritt*, 612 S.E.2d 818, 822 (Ga. Ct. App. 2005) ("Establishing a claim for breach of fiduciary duty requires proof of . . . damage proximately caused by the breach."  The same reasoning applies, as well, to Siblings alleged failure to promptly provide her with a copy of the Trust document upon her request.[4]

In sum, because Steele cannot show that she suffered damages as a result of the breaches of duty alleged in Counts 1 and 2, Siblings are entitled to summary judgment as to those Counts.

**Siblings' Motion for Summary Judgment on Counts 5 & 6 of the Counterclaim**

Siblings' *Third Motion for Summary Judgment* pertains to counts 5 and 6 of the *Counterclaim*.  [Doc. 59]  In count 5 Steele alleges that she suffered damages totaling $6,333.33 as a result of Siblings' unauthorized distributions from the Trust.  [Doc. 8 ¶¶ 32-36]  In count 6 Steele alleges that Siblings engaged in self-dealing, having allegedly received an unspecified amount of funds from the trust and, additionally, that Mrs. Strother paid $140,000 of a hospital bill incurred by Robin.  [Doc. 8 ¶¶ 37-40]

---

[4] The undisputed facts show that Steele requested a copy of the Trust in July 2012, and was provided with one after Mrs. Strother died in November, 2013.  [Doc. 58-1 ¶10; Doc. 69 p. 4]

As to count 5 of the *Counterclaim*, the undisputed material facts are that the alleged "unauthorized distributions" were used to honor Mrs. Strother's wishes by giving $10,000 to her long-time caretaker, $11,000 to her church and the pastor who performed her funeral ceremony, and $2000 to her pastor.  [Doc. 56 ¶12; Doc. 56-5 ¶ 8; Doc. 59 ¶¶ 2-3; Doc. 59-1 p. 2-3]  Siblings have agreed to deduct the cost of these distributions exclusively out of their shares of the Trust.  [Doc. 56 ¶ 12; Doc. 59 p.1]  As such, Steele concedes that the alleged unauthorized distributions are no longer at issue in this case. [Doc. 59 ¶¶ 2-3; Doc. 59-1 p. 2-3]  Because the parties have essentially resolved this matter through their agreement, there are no disputed material facts remaining as to count 5 of the *Counterclaim*.

As to count 6 of the *Counterclaim*, the uncontroverted evidence shows that Robin's medical bills were paid entirely by him personally, and by his insurance company; none were paid by Mrs. Strother or by the Trust.  [Doc. 59 p. 3; Doc. 58-1 ¶ 11 & p. 13-28]  Further, as to the non-specific allegations that Siblings engaged in self-dealing, both Robin and Gail have provided sworn affidavits stating that they never used assets from the Trust for their personal benefit.  [Doc. 58-1 ¶ 14; Doc. 56-5 ¶ 11]  Steele has not responded to Siblings' *Third Motion for Summary Judgment*,[5] she has not

---

[5] Siblings argue that Steele, having not filed a response to this Motion has effectively consented to the Court's granting it.  [Doc. 74 p. 1]  *See* D.N.M.LR-Civ. 7.1(b) ("The failure of a party to file and serve a response in opposition to a motion within the time prescribed for doing so constitutes consent to grant the motion.").  However, the Court may not grant a motion for summary judgment on the ground that the non-movant has failed to respond unless the moving party has first demonstrated that it is legally entitled to judgment as a matter of law.  *Reed v. Bennett*, 312 F.3d 1190, 1194-95 (10th Cir. 2002).

provided any evidence to support her claim regarding Robin's medical bills, nor has she provided evidence to controvert Siblings' sworn statements that they did not engage in self-dealing.   As such, based upon the uncontroverted evidence provided by Siblings relevant to Steele's claim of self-dealing, the Court concludes that Siblings have demonstrated that they are entitled to judgment as a matter of law as to Count 6 of the *Counterclaim*.

**Siblings' and Steele's Respective Motions for Summary Judgment on the Complaint**

In the *Complaint* Siblings deny that Steele is entitled to an accounting for any period prior to Mrs. Strother's death, and they seek a declaratory judgment and order: directing them to prepare an accounting of Trusts 1 and 2 from the date of Mrs. Strother's death; approving a final distribution of the Trust to Siblings and Steele; and ordering that the expenses incurred by Siblings as a result of this lawsuit be paid by the Trust.  [Doc. 1 ¶¶ 17, 21]  Siblings and Steele have each moved for summary judgment on the *Complaint*.[6] [Doc. 60; Doc. 62]  For the reasons stated in the Court's previously entered *Memorandum Opinion and Order* [Doc. 98], and for the reasons that follow, Siblings are not entitled to summary judgment on the *Complaint*.  For the reasons discussed herein, the Court concludes that Steele is entitled to partial summary judgment on the *Complaint*.

As thoroughly addressed in this Court's earlier *Memorandum Opinion and Order*, Steele is not entitled to an accounting of Trust 2 during the period that Mrs. Strother was

---

[6] Steele's *Motion for Summary Judgment on the Complaint* also seeks summary judgment in her favor on Counts 1, 2, 3, and 5 of the *Counterclaim*.  The Court having earlier in this Opinion granted Siblings' several *Motions for Summary Judgment* as to all Counts in the *Counterclaim*, does not consider them further.

alive and not incapacitated.  [Doc. 98 p. 9-11]  However, the Court concludes that Steele is entitled, as a matter of law, to an accounting for any period during which Mrs. Strother was alive, but lacked capacity to revoke Trust 2, because under that condition, Steele will have been a qualified beneficiary of Trust 2.  [Doc. 98 p. 4-6, 11]  Therefore, the pertinent question is whether, as a matter of law, Mrs. Strother lost capacity to revoke Trust 2, thereby rendering it irrevocable.

Pursuant to the UTC, "[t]he capacity required to . . .  revoke . . . a revocable trust or to direct the actions of a trustee of a revocable trust, is the same as that required to make a will."  Section 46A-6-601.  In New Mexico, "[t]he test of mental capacity [to make a will or a trust] is whether a person is capable of understanding in a reasonable manner, the nature and effect of the act in which the person is engaged."  *Matter of Head's Estate*, 615 P.2d 271, 274 (N.M. Ct. App. 1980).  "The presumption is in favor of competency."  *Id.*  To prevail in a challenge to a person's mental incapacity, a party must show by clear and convincing evidence that, at relevant times, the person was legally incapacitated.  *Id.* 274-75.  "Even where there is a pronounced mental incompetency, there may be ratification of previously executed transactions during lucid intervals."  *Id.* at 274.

Applying these standards to the present case, the question is whether Mrs. Strother, who indisputably suffered periods of dementia, and was eventually diagnosed with Alzheimer's disease, was nevertheless capable of understanding in a reasonable manner, the nature and effect of her power to administer and manage the Trust.  *Id.* (stating the standard relevant to the issue of legal incapacity); *see Anderson*, 477 U.S. at

248 (stating that in the context of summary judgment, "the substantive law will identify which facts are material"). Having reviewed the facts, the Court concludes that two time frames govern the issue of Mrs. Strother's legal capacity. The first is November 1999 to mid-2012, representing the period between Mr. Strother's death and the commencement of Mrs. Strother's residence in an Alzheimer's' facility. The second is mid-2012, when Mrs. Strother took residence in the Alzheimer's' facility, to her death in November 2012.

As to the first time frame, the facts show that Mrs. Strother was capable of understanding in a reasonable manner, the nature and effect of her power to administer and manage the Trust after Mr. Strother died, but before she took residence in the Alzheimers' facility. The uncontroverted evidence that throughout 2011 Mrs. Strother was attending to account balances, writing her own checks, keeping her check books precisely balanced; and that it was she who managed the assets of the Trust and maintained contact with the Trust's accountant. [Doc. 56-1 ¶ 4; Doc. 56-3 p. 3; 56-5 ¶¶ 4-5; Doc. 56-6 p. 8] Siblings had no substantial involvement in Mrs. Strother's financial affairs, including management of the Trust assets during this time frame. [Doc. 56-1 ¶ 4; Doc. 56-5 ¶ 4] Indeed, Steele essentially concedes the issue of Mrs. Strother's legal capacity during this first time frame— asserting only that it is "undisputed" that Mrs. Strother "was incapacitated from November 29, 2012 until her death[.]" [Doc. 41 ¶¶ 18-21, p. 11] In sum, there is no "genuine" issue as to Mrs. Strother's legal capacity prior to June 2012. *See Anderson*, 477 U.S. at 248 (stating that a "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

As with the first time frame, the material evidence pertaining to the second time frame forecloses a conclusion that a genuine issue exists as to whether Mrs. Strother was capable of understanding, in a reasonable manner, the nature and effect of her power to administer and manage the Trust.  In a November 2012 letter responding to Steele's request for copies of Trust-related documents, Siblings' attorney stated that "[s]ince [Mrs. Strother] is incapacitated [Siblings] have been managing and will continue to manage the Trust income and assets for [Mrs. Strother's] care and benefit during the remainder of [Mrs. Strother's] lifetime."  [Doc. 58-1 p. 10-11]  This representation of Mrs. Strother's capacity is further confirmed by Gail's representation, in a deposition, that, although they had never done so before, Siblings began to act jointly in administering the Trust in June or July of 2012 because Mrs. Strother was no longer capable of doing so herself.  [Doc. 63-2 p. 2, 4]  And it its likewise confirmed by Robin's deposition testimony, that he and his sister managed the income and assets of the Trust during Mrs. Strother's residence in the Alzheimer's facility because Mrs. Strother was incapacitated.  [Doc. 63-1 p. 11]

In support of their position that Mr. Strother was never legally incapacitated during her lifetime, Siblings point to the undisputed fact that even after Mrs. Strother took residence in the Alzheimer's' facility she had daily periods of lucidity during which she directed Siblings as to who should get monetary gifts, and in what amounts.  [Doc. 56-1 ¶ 5]  And they point to the fact, also undisputed, that Mrs. Strother's personal physician never opined that she was completely incapacitated.  [Doc. 56 ¶ 9; 56-5 ¶ 7]  However, when viewed in light of the representations by Siblings and their counsel about

Mrs. Strother's incapacity as directly related to her ability to manage the Trust, these ancillary facts not create a "genuine" issue.  *See Anderson*, 477 U.S. at 248 (stating that a "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").  The Court concludes that, as a matter of law, Mrs. Strother was incapacitated and Trust 2 irrevocable, from June 2012 to November 2013.  As such, for the reasons set forth in the Court's prior Memorandum Opinion and Order [Doc. 98], Steele is entitled to an accounting of Trust 2 from June 2012 to the present.

For the foregoing reasons, the Court denies Siblings' *Fourth Motion for Summary Judgment on Their Complaint for Declaratory Judgment and Memorandum of Law in Support Thereof* to the extent that it seeks to avoid accounting to Steele for any period prior to Mrs. Strother's death.  Steele's *Motion for Partial Summary Judgment on Complaint and Counts 1,2, 3, and 5 of the Counterclaim* is granted to the extent that Steele seeks an accounting of Trust 2 from June 2012 to the present; and it is otherwise denied.

**CONCLUSION**

*Plaintiffs' First Motion for Summary Judgment on Counts 3 and 4 of Counterclaim: Issues of Accounting and Segregation of Accounts and Memorandum of Law in Support Thereof* [Doc. 56] is **granted**; *Plaintiffs' Second Motion for Summary Judgment on Counts 1 and 2 of Counterclaim: Issues of Whether Plaintiffs Had Duty to Report and Provide Copy of Trust Agreement and Memorandum of Law in Support Thereof* [Doc. 57] is **granted**; *Plaintiffs' Third Motion for Summary Judgment on Counts*

*5 and 6 of Counterclaim:  Issues of Payment of Robin D. Strother Medical Bills and Distributions to Ruth's Church and Caretaker* [Doc. 59] is **granted**; *Plaintiffs' Fourth Motion for Summary Judgment on Their Complaint for Declaratory Judgment and Memorandum of Law in Support Thereof*  [Doc. 60] is **denied**; and *Defendant's Motion for Partial Summary Judgment on Complaint and Counts 1, 2, 3, and 5 of the Counterclaim* [Doc. 62] is **granted in part** to the extent that it seeks an accounting of Trust 2 from June 2012, and it is otherwise **denied**.

      **IT IS SO ORDERED** this 16th day of May, 2016 in Albuquerque, New Mexico.


                                  _____

                                   **M. CHRISTINA ARMIJO**
                                  **Chief United States District Judge**